IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MEGHAN SONNIER SIMMS, individually and GABRIELA LAVINE as Next Friend of Minor J.S. and on behalf of the Estate of JERMAINE K. SONNIER, | § § § § § | |
| Plaintiffs, | § § | |
| v. | § § § | CIVIL ACTION NO. 4:23-cv-2004 JURY TRIAL DEMANDED |
| JERRY RIVERA, , ANTHONY JACKSON, GARRETT PULATIE, PERRY FENOGLIO, WILLIAM KEEFE, ERIC MALDONADO, JOSEPH BRAVO, TAYLOR PEACOCK, , CITY OF HOUSTON, TEXAS, NICOLAS DAHL, VINCENT GARCIA, SEAN DAILEY, JESSICA SMITH, DEREK LEFERINK, CHRISTOPHER FINLAN and HERNAN ARMENDARIZ,                    , | § § § § § § § § § § § § | |
| Defendants. | § | |

## PLAINTIFFS' SECOND AMENDED COMPLAINT

COMES NOW, Meghan Sonnier Simms, individually as the surviving mother of Jermaine K. Sonnier ("Sonnier") deceased and Gabriela Lavine, as next friend of J.S., the minor son of Jermaine K. Sonnier and on behalf of the Estate of Jermaine K. Sonnier ("Sonnier") deceased, complaining of Defendant Officers Jerry Rivera, Anthony Jackson, Garrett Pulatie, Perry Fenoglio, William Keefe, Eric Maldonado, Joseph Bravo, Taylor Peacock, (collectively the "Defendant Officers"), Nicolas Dahl, Vincent Garcia, Sean Dailey, Jessica Smith, Derek Leferink, Christopher Finlan and Hernan Armendariz (collectively the "Defendant Firemen"), and the City of Houston, Texas, more particularly the Houston Police Department ("HPD") and for cause of action will respectfully show unto this Honorable Court as follows:

Page 1

> To establish deliberate indifference, "the plaintiff must show that the officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.' "

*Domino v. Texas Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001); quoting *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir.1985).

## I.

## <u>NATURE OF THE ACTION</u>

1.      This is an action brought by the Plaintiffs against the Defendant Officers for their use of excessive, deadly force and failure to render medical aid or promptly calling for emergency assistance in the face of known, serious medical emergency, resulting in the death of Jermaine Sonnier ("Sonnier") under the color of law in violation of his individual rights under the Fourth and Eighth Amendments of the United States Constitution and in violation of his civil rights pursuant to 42 U.S.C. § 1983.[1]  The Plaintiffs also bring this action against the Defendant Firemen for their failure to timely render medical assistance to Sonnier despite the obvious need to do so. Plaintiffs and the statutory beneficiaries are entitled to recover damages arising from the decedent's wrongful death as applied under 42 U.S.C § 1983 and all other applicable laws complaining of the various acts listed below and for their wrongful death cause of action.

2.      The Defendant Officers consciously disregarded the rights of Sonnier, knowing that the Policymakers would ratify and/or approve of their actions. In fact, the Chief of Police of the HPD was aware of the wrongful actions of the Defendant officers but defended their actions. The Chief of Police was aware that although Sonnier was falsely accused of engaging in a drug

---

[1] The Plaintiffs made multiple requests to the City and its attorneys for reports and other information regarding the incident.  The City refused to produce any incident reports, body cam footage and the name of the officers and firemen involved in the incident.

transaction and was aware that no drugs were found on or near Sonnier. In fact, Defendant Maldonado confirmed that there were no drugs found on or near Sonnier. Sonnier was wrongfully profiled by the Defendant officers because of his race, the car he was in and the area where they were located.  The Defendant officers' actions resulted in the death of Sonnier.  The Harris County Medical Examiner ruled Sonnier's death as a Homicide. Despite having knowledge that Sonnier's death was ruled as a Homicide, that no drugs were ever found on Sonnier and that the statements provided by the Defendant officers were not consistent, the Chief of Police and the City defended and ratified the wrongful conduct of the Defendant officers. Chief of Police Finner released the bodycam footage of the incident shortly after the incident but later had the video deleted and removed from the internet after it was ruled Sonnier's death was a homicide.  The Defendant Officers knew Sonnier faced a substantial risk of serious medical harm but failed to timely render medical assistance. Had the Defendant Officers and Firemen provided Sonnier with prompt medical assistance, including the immediate transport to the hospital when he first advised the Defendant Officers that he was experiencing severe chest pain and he couldn't breathe, Sonnier would have had more than a fifty percent chance of survival. For these civil rights violations and other causes of action discussed herein, Plaintiffs seek to hold the Defendants responsible and compensate them for their damages and the wrongful death of Sonnier.

3.    On June 16, 2021, Defendant Rivera tased Sonnier although he was not resisting or a threat to any of the officers. In fact, Sonnier asked the Defendant Officers what did he to wrong but instead of simply answering, they assaulted him. Defendant Garrett Pulatie repeatedly punched a defenseless Sonnier in the head and shoulder causing multiple abrasions and bruising to Sonnier's head and shoulder.  Defendants Rivera, Pulatie, Fenoglio,

Keefe, Maldonado, Bravo and Peacock used improper physical restraints, while on top of Sonnier which resulted in Sonnier going into medical distress. Sonnier was unable to breathe due to the excessive force and physical restraint used against him. Upon the Defendant Firemen's arrival on the scene, they observed Sonnier in clear medical distress but failed to provide immediate care to Sonnier despite knowledge of his condition. As a result of the physical restraints administered by Defendants Pulatie, Fenoglio, Keefe, Maldonado, Bravo and Peacock. the excessive tasing by Rivera, and being punched repeatedly in the head by Pulatie, Sonnier requested help, but the Defendants deliberately chose not to provide and/or summon immediate medical care, despite the obvious need to do so, resulting in Sonnier's painful death. The Defendant Officers were aware of Sonnier's need for immediate medical help but instead of providing him with medical assistance, Defendant Jackson instead dragged Sonnier on the ground, causing bruising to Sonnier's leg, and placed him in the back of the patrol vehicle although Sonnier was pleading with the Defendant Officers for help. At one point, Sonnier told the Defendant Officers, "I swear on my son, I'm about to die" but the Defendant Officers ignored Sonnier's plea for help.

4.      Due to the physical force used by the Defendant Officers and their failure to assist Sonnier, despite his obvious need for help, Sonnier became nonresponsive and subsequently died. Each of the Defendant Officers in this case had a duty to provide adequate medical care for Sonnier, while he was in their custody and care but failed to do so. In fact, the Defendant Officers knew and were told on the scene that they had an obligation to assist Sonnier. Additionally, Defendants Rivera and Pulatie used excessive force against Sonnier that was clearly unreasonable given the circumstances of his arrest. The Defendant Officers were deliberately indifferent to Sonnier's known medical issues, both in violation

of his Eight and Fourteenth Amendments rights under the United States Constitution secured pursuant to 42 U.S.C. § 1983.

5.    These violations were committed because of the customs or lack thereof of the City of Houston, Texas (the "City").  The Plaintiffs allege that Mayor Sylvester Turner, the city council and the Houston Police Department Chief Troy Finner, the City's final policymakers for the HPD (collectively referred herein as the "Policymakers"), vested with all powers of the City and with the determination of all matters of policy, vested with the authority for setting policies for city of Houston Police Officers, had a duty, but failed to enforce such policies, practices and procedures for HPD that respected Sonnier's constitutional rights to protection and equal treatment under the law. The Policymakers failed to properly discipline or otherwise control officers.  The Policymakers ratified the wrongful conduct of the Defendant Officers as they have done in cases involving the wrongdoing of a HPD officers.

6.     The Defendant Officers consciously disregarded the rights of Sonnier, knowing that Chief Finner, the final decisionmaker for the HPD, would ratify and/or approve of their actions.  For these civil rights violations and other causes of action discussed herein, Plaintiffs seek answers and compensation for damages.

7.    The Plaintiffs bring this action  for the wrongful death of Sonnier, and on behalf of the estate of Jermaine Sonnier for the pain and suffering Sonnier experienced prior to his death.

8.    Sonnier died because the Defendant Officers and Firemen failed to provide him with adequate medical care although they were informed that he was in distress and that he needed immediate medical attention.  Due to these failures, Lee was pronounced dead after a long delay in providing him with any medical assistance.

9.     Plaintiffs herein comply with the pleading requirements of FRCP Rule 8(a)(2) and the requirements of *Ashcroft v. Iqbal*, 556 U.S. 129 S.Ct. 1937, 1949 (2009) that "a claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

## II.

## PARTIES

10.     At all relevant times, Plaintiffs J.S., a minor, by and through his next friend, Gabriela Lavine, and Meghan Sonnier Simms were and are residents of Harris County.

11.     Meghan Sonnier Simms, the surviving parent of the Decedent, is a citizen of the United States and a resident of Houston, Texas.  Meghan Sonnier Simms is the biological mother of the Decedent.

12.     Gabriela Lavine, as Next Friend of minor J.S., is a citizen of the United States and a resident of Houston, Texas.  Gabriela Lavine is the biological mother of J.S., the surviving biological son and only child of Decedent. Lavine brings this wrongful death action on behalf of J.S. and survival action on behalf of the Estate of Jermaine K. Sonnier, pursuant to Tex. Civ. Prac. & Rem. Code §71.021. Sonnier died without a will. No administration of the Estate of Jermaine K. Sonnier is pending, and none is necessary.  *Roundtree v. City of San Antonio, Tex.,* No. SA-18-CV-01117-JKP-ESC, 2022 WL 508343, at *5 (W.D. Tex. Feb. 17, 2022) (citing *Aguirre v. City of San Antonio,* 995 F.3d 395, 423 (5th Cir. 2021)); *Adkinson,* 2020 WL 137226, at *2.

13.     J.S., through his next friend, Gabriela Lavine, is the sole heir to Decedent's estate.  Decedent's estate had no debts at the time of his death, no real property, and no other children. Decedent was not married at the time of his death. Thus, J.S., through his next friend,

Page 6

Gabriela Lavine—Sonnier's biological son—qualifies as an heir entitled to sue on behalf of the Estate of Jermaine Sonnier.

14.    Defendant City of Houston, Texas is a municipality existing under the laws of the State of Texas and situated mainly in Harris County.  The City, through its Mayor, Sylvester Turner, appoints the Chief of Police who must be confirmed by the City Council.  The Chief, with the approval of the Mayor and city council, is responsible for HPD's general orders, policies, procedures, and customs, as well as the acts and omissions challenged by this suit. HPD is also responsible for preventive, investigative, and enforcement services for all citizens of Houston. All actions that form the basis of this lawsuit were performed pursuant to general orders, policies and procedures, customs and practices of Defendant, City. The City has a responsibility and duty to promulgate, implement, train, and enforce policies and procedures related to providing medical attention for arrestees/individuals in police custody.  Defendant City of Houston has been served and has appeared in this case.

15.    Defendant Jerry Rivera is an individual residing in Harris County, Texas and is an officer with the Houston Texas Police Department.  Defendant Rivera has been served and has appeared in this case. Defendant Rivera is being sued in his individual capacity.

16.    Defendant  Anthony Jackson is an individual residing in Harris County, Texas and is an officer with the Houston Texas Police Department Defendant Jackson has been served and has appeared in this case.  Defendant Jackson is being sued in his individual capacity.

17.    Defendant  Garrett Pulatie is an individual residing in Harris County, Texas and is an officer with the Houston Texas Police Department. Defendant Pulatie has been served and has appeared in this case.  Defendant Pulatie is being sued in his individual capacity.

18.    Defendant  Perry Fenoglio is an individual residing in Harris County, Texas and is

an officer with the Houston Texas Police Department. Defendant Fenoglio has been served and has appeared in this case.  Defendant Fenoglio is being sued in his individual capacity.

19.    Defendant William Keefe is an individual residing in Harris County, Texas and is an officer with the Houston Texas Police Department. Defendant Keefe has been served and has appeared in this case. Defendant Keefe is being sued in his individual capacity.

20.    Defendant  Eric Maldonado is an individual residing in Harris County, Texas and is an officer with the Houston Texas Police Department.  Defendant Maldonado has been served and has appeared in this case.  Defendant Maldonado is being sued in his individual capacity.

21.    Defendant  Joseph Bravo is an individual residing in Harris County, Texas and is an officer with the Houston Texas Police Department. Defendant Bravo has been served and has appeared in this case.  Defendant Bravo is being sued in his individual capacity.

22.    Defendant Taylor Peacock is an individual residing in Harris County, Texas and is an officer with the Houston Texas Police Department, Defendant Peacock has been served and has appeared in this case. Defendant Peacock is being sued in his individual capacity.

23.    Defendant Nicholas Dahl is an individual residing in Harris County, Texas and is employed by the Houston Fire Department, and may be served at his place of employment at the Houston Fire Department located at 901 Bagby, Houston, Texas, or wherever he may be found. Defendant Dahl is being sued in his or her individual capacity.

24.    Defendant Vincent Garcia is an individual residing in Harris County, Texas and is employed by the Houston Fire Department, and may be served at his place of employment at the Houston Fire Department located at 901 Bagby, Houston, Texas, or wherever he may be found. Defendant Garcia is being sued in his or her individual capacity.

25.    Defendant Sean Dailey is an individual residing in Harris County, Texas and is

employed by the Houston Fire Department, and may be served at his place of employment at the Houston Fire Department located at 901 Bagby, Houston, Texas, or wherever he may be found. Defendant Dailey is being sued in his or her individual capacity.

26.    Defendant Jessica Smith is an individual residing in Harris County, Texas and is employed by the Houston Fire Department, and may be served at her place of employment with the Houston Fire Department located at 901 Bagby, Houston, Texas, or wherever she may be found. Defendant Smith is being sued in his or her individual capacity.

27.    Defendant Derek Leferink is an individual residing in Harris County, Texas and is employed by the Houston Fire Department, and may be served at his place of employment at the Houston Fire Department located at 901 Bagby, Houston, Texas, or wherever he may be found. Defendant Leferink is being sued in his or her individual capacity.

28.    Defendant Christopher Finlan is an individual residing in Harris County, Texas and is employed by the Houston Fire Department, and may be served at his place of employment at the Houston Fire Department located at 901 Bagby, Houston, Texas, or wherever he may be found. Defendant Finlan is being sued in his or her individual capacity.

29.    Defendant Hernan Armendariz is an individual residing in Harris County, Texas and is employed by the Houston Fire Department, and may be served at his place of employment at the Houston Fire Department located at 901 Bagby, Houston, Texas, or wherever he may be found. Defendant Armendariz is being sued in his or her individual capacity.

### III.

### JURISDICTION AND VENUE

30.     Jurisdiction exists in this court pursuant to 28 U.S.C. §§ 1331 and 1343 as this action is brought under, inter alia, the Fourth and Eighth Amendments of the United States Constitution and 42 U.S.C. § 1983, to redress the deprivation of rights, privileges and immunities guaranteed to decedent Sonnier, by constitutional and statutory provisions.

31.     Venue is proper in the Southern District of Texas pursuant to 28 U.S.C. §1391 because the Defendants are domiciled and/or reside in Southern District of Texas and all or a substantial part of the incidents, events and occurrences giving rise to this action accrued in the Southern District of Texas.

### IV.

### FACTS COMMON TO ALL CAUSES OF ACTION

#### Sonnier's Fatal Encounter with the Defendant Officers

32.     Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth herein in this cause of action.

33.     On or about June 16, 2021, at approximately 1900 hours, Sonnier was with a female friend just hanging and was in the process of going to wash her car when they were approached and followed for no reason by one of the Defendant officers who was in plain clothes and another officer who was in an unmarked black truck.  Not knowing what was going on or who they were, Sonnier decided to run to a safe location because he was afraid for his life.  Sonnier was unaware of who was chasing them and was not running because he did something wrong. The unidentified individuals, now known to be the Defendant officers, pursued Sonnier on foot, for reasons unknown to Sonnier.  At all times, Sonnier was unarmed

and was not threatening or trying to harm the officers or any other person. The Defendant Officers, without a need to do so, and without identifying themselves as HPD officers, chased Sonnier for approximately one minute before catching up with him.

34.    According to a witness, the Defendant Officers, specifically Defendant Rivera and Pulatie, viciously tackled Sonnier to the ground, Pulatie repeatedly punched Sonnier in the head and placed him in a prone position, although Sonnier was not resisting, nor had he committed a penal offense in the presence of the officers or anyone else.  Defendant Rivera, without attempting to de-escalate the situation, and immediately resorting to using force, tased Sonnier in the chest multiple times, which is known to be painful, is not recommended, can result in death, and is a prohibited area to tase a suspect. Defendant Rivera tased a shirtless Sonnier in the chest causing a painful injury. At no time did Defendant Pulatie or any of the other Defendant Officers attempt to stop Defendant Rivera.  The taser used by Defendant Rivera, also known as a conducted energy device, was in direct contact with Sonnier's wet skin, causing excruciating pain and suffering.

35.    Defendant Rivera continued to cycle the taser even though Sonnier was outnumbered, was not resisting, and was not a danger to himself or anyone else. Defendant Officers Pulatie, Fenoglio, Keefe, Maldonado, Bravo and Peacock were on top of Sonnier, using their knees to apply brutal force to Sonnier's body,  as he laid on the ground in a prone position. It was difficult for Sonnier to breathe because he was in a prone position and the Defendant Officers were on top of him with their full body weight making it difficult for Sonnier to breathe. According to a witness, the movement by Sonnier was his struggle to breathe and not resisting, which the officers could clearly observe as Sonnier was telling them he could not breathe. Sonnier did not hit any of the Defendant Officers, nor did he make any threats to harm the

Defendant Officers. Defendant Pulatie repeatedly punched Sonnier in the head and back, causing multiple abrasions, and bruising. Sonnier screamed in pain as Defendant Pulatie repeatedly punched him for no lawful reason, and although Sonnier was not resisting.

36.    Defendant Rivera tased Sonnier without announcing that he was about to discharge his taser. At no time did Rivera say "taser, taser" and in fact, Defendant Peacock was also tased due to the manner in which an out-of-control Rivera deployed his taser.

37.    At the point upon which Sonnier was tased by Defendant Rivera, according to a witness, Sonnier was not engaged in active aggression and was not actively resisting by attempting to flee. Once he was tackled to the ground, Sonnier had no opportunity to comply with the Defendant Officer's commands prior to being tased. Sonnier was not resisting nor was he attempting to harm the officers or any other person when Defendant Pulatie repeatedly punched him with a close fist.

38.    Sonnier repeatedly stated "I didn't do nothing" but one of the Defendant Officer's responded, after Sonnier had been tased, "put your hands behind your back or I'm going to hit you." Sonnier attempted to comply with the commands but was unable to due to the actions of Defendant Officers Rivera, Pulatie, Fenoglio, Keefe, Maldonado, Bravo and Peacock.

39.    Sonnier was handcuffed, hands behind his back and was then lying on the ground, prone, on his stomach as he was attacked by Defendant Officers Rivera, Pulatie, Fenoglio, Keefe, Maldonado, Bravo and Peacock.

40.    Even though Sonnier was handcuffed and prone, Defendant Jackson stated, "you can walk or get dragged, it's your choice."

41.    Sonnier was clearly in medical distress and in need of help. When the Defendant Officers, specifically Jackson and Maldonado, attempted to stand Sonnier up, he immediately

Page 12

slumped over, his legs buckled, and he could not stand up which led to a barrage of yelling at Sonnier from the Defendant Officers.  At one point, Sonnier began to throw up and was clearly having panic attacks, further signaling he needed medical help.

42.    Defendants Jackson and Maldonado dragged and then carried a distressed Sonnier to the patrol car and pushed him into the back seat without checking on him.  At one point, Sonnier told the Defendant Officers "I swear on my son, I'm about to die", but the Defendant Officers failed to provide Sonnier with any assistance although he begged for their help.  Instead, the Defendant Officers were observed laughing at Sonnier.

43.    Just before being pushed into the patrol car, Sonnier, desperately begging for help, shouted out "I can't fucking breathe" to which Defendant Jackson responded, "Well get in the car." The Defendant Officers failed to immediately summon help although they knew Sonnier had been tased, complained of chest pain, told the officers he could not breathe and that he was going to die.

44.    Defendant Peacock went to the other side of the car and pulled Sonnier across the back seat stating to the other officers, "get him halfway in and I'll grab his arms."  As Defendant Maldonado pulled Sonnier across the backseat, his head was banged on the floor by Defendant Jackson.

45.    Once Sonnier was laying across the backseat of the patrol car, his head was hanging off the seat, making it even more obvious to the Defendant Officers he was in medical distress.  Defendant Peacock, instead of offering aid to Sonnier, stuffed Sonnier's head into the car and both car doors were shut.  According to a witness, Sonnier was clearly nonresponsive and in medical distress, but each of the Defendant Officers failed to assist Sonnier.  The

Defendant Officers failed to immediately report that Sonnier had been tased although it is required by policy so that the individual can receive medical assistance.

46.     The Defendant Officers left Sonnier inside of a closed patrol car laying across the seat for a period of time without being checked on or transported to the hospital.  At some point, Defendant Jackson went to the patrol car, opened the door, and just watched Sonnier as he struggled to breathe and pleaded for help.  Defendant Jackson did not, however, offer any medical assistance or first aid to Sonnier even though he was in medical distress.

47.     Approximately twenty minutes after Sonnier was placed into the patrol car, one of the Defendant Officers finally radioed that they "needed extra D" and that the "suspect was complaining of chest pain and arm pain."

48.     Approximately thirty minutes after Sonnier was tackled, the Defendant Firemen arrived, and Sonnier was pulled out of the patrol car and left on the ground.  The Defendant Firemen failed to provide Sonnier with immediate medical attention although it was obvious that he was struggling to live.

49.      Five (5) minutes later Sonnier began loudly screaming and groaning for several minutes.  It was at that point that the Defendant Firemen placed Sonnier onto a gurney.  Sadly, one of the Defendant Officers sarcastically stated that it would be easier on your heart if you complied and stopped moving even though Sonnier's movements were minimal and/or involuntary.

50.     Sonnier was placed into the ambulance approximately thirty (30) minutes, give or take, after he was first tased by Defendant Rivera, punched repeatedly by Defendant Pulatie, while Defendant Officers Fenoglio, Keefe, Maldonado, Bravo and Peacock were on top of Sonnier, making it difficult for Sonnier to breathe.  Even though Sonnier was clearly in medical

distress, based on the information they received from the Defendant Officers, the Defendant Firemen chose to transport Sonnier to the hospital without a paramedic present in the ambulance. Defendant Jessica Smith stated that she felt badly about that decision and knew that was not the proper thing to do but nothing was done to correct the wrongdoing. Instead of rendering aid to Sonnier, the Defendant Officers were laughing and making fun of Sonnier.

51.     Approximately forty-six (46) minutes after Sonnier was violently taken to the ground, tased, punch, kneed and placed in a prone position with the weight of Defendant Officers Rivera, Pulatie, Fenoglio, Keefe, Maldonado, Bravo and Peacock on top of him preventing him from breathing, Sonnier went into cardiac arrest. Approximately one (1) hour and ten (10) minutes after Sonnier was violently taken to the ground, tased, and placed in a prone position with the weight of the officers on top of him, Sonnier was pronounced dead.

52.     According to the autopsy report, the medical examiner ruled Sonnier's death a homicide. The autopsy report also revealed Sonnier suffered multiple injuries:

**l. EVIDENCE OF DEPLOYMENT OF ELECTROMUSCULAR DISRUPTION DEVICE (EDD)**

Per law enforcement report, there was an EDD deployment; no metal barbs or other evidence of the devices are identified at autopsy. A defect, consistent with a puncture wound, is seen, which may represent an injury related to EDD deployment.

On the medial left lower chest, located 17-3/4 inches below the top of the head, 2-1 /8 inches to the left of the anterior midline, and 2-1 /4 inches inferior and 2-1/16 inches medial to the left nipple, is a 1 /8 by 1/16 inch dry, red defect, consistent with a puncture mark. The puncture mark extends shallowly into the subcutaneous soft tissue with minimal surrounding hemorrhage.

**ll. MULTIPLE BLUNT FORCE INJURIES:**

**BLUNT FORCE INJURIES OF THE HEAD:** A 1 by 5/16-inch cluster of parallel, oblique, linear, red abrasions is on the right forehead. Two, 1 /16 and 1 /4-inch oblique, linear, red abrasions are on the left forehead at the hairline. A 3/4 by 1 /4-inch cluster of

parallel, oblique, linear, red abrasions is on the medial left forehead. Multiple, 1/8 to 3/4 inch linear, red-purple abrasions are on the right cheek and preauricular skin. Internally, the left frontal scalp has focal hemorrhage.

**BLUNT FORCE INJURIES OF THE TORSO:** Multiple, 1 /16-to-7/8-inch irregular to linear, purple abrasions are on the left upper chest. A 5-3/4 by I -I / 2-inch cluster of red-purple, dry, linear abrasions is on the left lower back.

**BLUNT FORCE INJURIES OF THE EXTREMITIES:**

**RIGHT UPPER EXTREMITY:** A 1-5/8 by 1/2-inch cluster of injuries, comprised of two, parallel, horizontal, linear, red-purple contused abrasions surrounded by background pink-red contusion, are on the posterior and medial right wrist. Two, 1/16- and 3/16-inch vertical, linear, red abrasions are on the posteromedial right wrist. A 3/16 by 1/8-inch cluster of confluents, linear, pink-red abrasions is on the dorsal right hand. A 1/16-inch red abrasion is on the dorsal right hand adjacent to the right second finger. A 1/16-inch red abrasion is on the dorsal right fifth finger. A 1 /16-inch red abrasion is on the palmar right hand.

Internally, the subcutaneous soft tissue of the right wrist has patchy hemorrhage.

**LEFT UPPER EXTREMITY:** A 3-3/4 by 2-1/2-inch cluster of faint pink-red, speckled to parallel, linear contused abrasions are on the left shoulder. A 1-1/8-inch linear, red abrasion is on the posteromedial left elbow. A 1-1/2 by 7/8-inch cluster of injuries, comprised of multiple, 1/16-to-3/4-inch red abrasions with variable parallel, horizontal, linear patterning, is on the anterolateral left wrist. A 1-1/2 by 1/2-inch cluster of injuries, comprised of two, parallel, horizontal, linear, pink-red contused abrasions with background pink contusion, are on the posterior and medial left wrist. Two, 1/16-inch red abrasions are on the dorsal left fourth and fifth fingers.

Internally, the subcutaneous soft tissue of the left wrist has patchy hemorrhage.

**RIGHT LOWER EXTREMITY:** Multiple, 1/8 to 1 inch irregular to linear, red abrasions are on the right knee. Two, 1-1/2 inch parallel, curvilinear, red-purple abraded contusions are on the proximal anterior right leg. An approximately 1-1/2 by 1-inch ovoid faint pink contusion is on the distal posterior right leg. A 7/8 inch red-yellow, linear abrasion is on the lateral right ankle. A 1-1 /4-inch curvilinear, red abrasion is on the posterolateral right foot.

**LEFT LOWER EXTREMITY:** Multiple, 1/8 to 1-1/8-inch angulated, red abrasions are on the left knee. Multiple, punctate to 1/2 inch variably confluent red abrasions with background pink-red contusion are on the proximal lateral

left leg. An approximately 1-3/4 by 1/2 inch ill-defined, ovoid, pink contusion is on the anterior left leg.

53.     The autopsy report supports witness accounts of the excessive force used on Sonnier. In an attempt to cover up their wrongdoings after the incident, which the chief of Police, the final decisionmaker for the HPD, was aware of and ratified. False statements such as the following were made by the Defendant Officers:  "He started kicking himself out of the car." "He started fighting with us, so we dragged him to the car."  "I was about to start giving it to him."  "He was playing possum."  "I manhandled him down" and that's when Defendant Rivera came up and tased him.  The Defendant Officers had no regard for the fact that Sonnier had been tased in the chest and then complained of chest pains. The Defendant Officers took no action to provide Sonnier with aid while waiting for medical assistance, even though Defendant Pulatie repeatedly punched Sonnier in the head, which should have been immediate but was not.  The Defendant officers were more interested in getting their stories together than they were in assisting Sonnier, who needed medical attention. The Defendant Officers were observed at the scene discussing the incident after Sonnier was transported to the hospital.  The involved officers were not separated at the crime scene and were able to discuss the incident to have consistent stories as to what occurred.

54.     When Sergeant N. Garza, a supervisor, arrived on the scene he did not check on Sonnier and did not ensure that Sonnier received first aid and immediate medical attention from the Defendant Officers. Sergeant Garza and Chief Finner were aware that the officers did not handle Sonnier properly but did not recommend any discipline for the Defendant Officers.

55.     As a direct and proximate result of the Defendants' conduct, the Plaintiffs have sustained substantial damages and pecuniary loss.

56.     Sonnier was nineteen (19) years old when the Defendant Officers caused his death.  Sonnier was in good health, with a reasonable life expectancy of living at least 60 more years to age 79.  Sonnier leaves behind his minor son and his Mother.

57.     The Plaintiffs have suffered pecuniary losses from the death of Sonnier by virtue of the destruction of the parent-child relationship, including the right to love, affection, solace, comfort, companionship, society, emotional support, and happiness.  The Plaintiffs will suffer anguish, grief, and sorrow as a result of Sonnier's death and are likely to continue to suffer for a long time in the future. The closeness of Plaintiffs' relationship with Sonnier is demonstrated in many ways including the time they spent together, and the things Sonnier did for his minor son and Mother.  For these losses, the Plaintiffs seek damages in a sum in excess of the minimum jurisdictional limits of the court.

58.     HPD has not disciplined the officers who were involved in using excessive force against Sonnier and ignored his complaints of chest pains and that he could not breathe, which resulted in his death.   The City, through its Policymakers and the final decisionmaker for the HPD, ratified the wrongful conduct of the Defendant Officers.

**V.**

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**
**DELIBERATE INDIFFERENCE TO MEDICAL NEEDS**
**Violation of the Eight and Fourteenth Amendments Pursuant to 42 U.S.C. § 1983**
**Against the Defendant Officers**

59.     Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought herein in this cause of action.

Plaintiffs would show that Defendants' actions on the occasion in question were wrongful in depriving Sonnier of his constitutional rights, as alleged more fully below.

60.    The Fourteenth Amendment guarantees arrestees/detainees a right "not to have their serious medical needs met with deliberate indifference on the part of the confining officials." *Dyer v. Houston*, 955 F.3d 501, 506 (5th Cir. 2020) (*citing Thompson v. Upshur Cty., Tex.*, 245 F.3d 447, 457 (5th Cir. 2001) (*citing, inter alia, Estelle v. Gamble*, 429 U.S. 97, 103 (1976))).

61.    To succeed on a deliberate-indifference claim, Plaintiffs must show that (1) the official was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and (2) the official actually drew that inference. *Dyer*, 955 F.3d at 506 (*citing Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 755 (5th Cir. 2001) (*quoting Farmer v. Brennan*, 511 U.S. 825, 837 (1994))).

62.    Sonnier had a constitutional right to medical care under the Fourteenth Amendment while in Defendants' custody.

63.    Refusing to treat a prisoner's complaints can give rise to Section 1983 liability. *Galvan v. Calhoun Cty.*, 719 F. App'x 372 (5th Cir. 2018); *Easter v. Powell*, 467 F.3d 459, 461–65 (5th Cir. 2006); *Harris v. Hegmann*, 198 F.3d 153, 159–60 (5th Cir. 1999); *Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 422 n.8. (5th Cir. 2017).

64.    An episodic-acts-or-omissions claim faults specific officials for their acts or omissions.

65.    As to the individual in an episodic-acts-or-omissions claim, the relevant question becomes "whether that official breached his constitutional duty to tend to the basic human needs of persons in his charge." *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 645 (5th Cir. 1996).

66.    An official's actual knowledge of a substantial risk may only be inferred if the "substantial risk" was obvious. *Easter*, 467 F.3d at 463.

67.    Deliberate indifference is shown when a Plaintiff properly alleges that officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Domino*, 239 F.3d at 756 (*quoting Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985)).

68.    The Defendant Officers and Firemen failed to follow proper medical guidelines by refusing to get the Decedent the needed immediate attention. Despite being aware that Sonnier required immediate medical attention, Defendant Officers and Firemen ignored his pleas and complaints. The Defendant Officers also failed to provide first aid to Sonnier while waiting for medical personnel to arrive.

69.    The Defendant Officers and Firemen refusal to treat Sonnier and ignoring his repeated pleas and complaints were acts of subjective deliberate indifference that caused an unconstitutional delay in medical treatment which caused Sonnier's death.

**The Defendant Officers and Firemen were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed.**

70.    The Defendant Officers and Firemen were aware of and ignored obvious indicia of a risk of serious harm, specifically including but not limited to, the facts that Defendant Rivera tased Sonnier directly on his bare chest and then Sonnier complained of chest and arm pain, that his body was limp, and he could not stand or walk, that his head was slammed on the patrol car floor, Defendant Pulatie repeatedly punched Sonnier and Sonnier stated he could not breathe, he was throwing up and indicated he was dying.

71.     Thus, the Defendant Officers and Firemen were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed.  *Dyer*, 964 F.3d at 380.

<u>**The Defendant Officers and Firemen**</u>
<u>**actually drew that inference.**</u>

72.     The Defendant Officers and Firemen actually drew this inference because they acknowledged Sonnier's statements complaining of chest pains, and not being able to breathe. Furthermore, they knew he could not stand on his own and had to drag him and carry him to the patrol car. The Defendant Officers and Firemen were aware that Sonnier was in trouble.  In fact, Sonnier told the Defendant Officers he was dying.

73.     Further, the Defendant Officers' actual knowledge of the substantial risk can be inferred because it was so obvious and the need was so apparent that even laymen would recognize that care is required – as Sonnier had been tased in the chest and then complained of chest and arm pain, stated he couldn't breathe, he could not walk to the patrol car, was throwing up and his head was banged against the floor.  And when the Defendant Firemen finally pulled Sonnier out of the patrol car and left him on the ground for unknown reasons, he was screaming and groaning in agony.  *Dyer*, 964 F.3d at 380; *Easter*, 467 F.3d at 463; *Domino*, 239 F.3d at 756; *Gobert*, 463 F.3d at 345. Thus, the Defendant Officers and Firemen actually drew the inference that a substantial risk of serious harm existed.

74.     Accordingly, the Defendant Officers and Firemen were deliberately indifferent to Sonnier's health and safety because they "refused to treat him ... or [they] engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs" by not providing first aide or summoning *immediate* medical care for Sonnier, rather than leaving him in a patrol car for twenty minutes and then on the wet concrete for another ten or fifteen minutes

before he was placed on a gurney and then finally put in an ambulance. Instead, the Defendant Officers belittled, made fun of Sonnier, and disregarded the fact that Sonnier was in medical distress. *Domino*, 239 F.3d at 756 (*quoting Johnson*, 759 F.2d at 1238).

75.    Failing to promptly call for emergency assistance in the face of known, serious medical emergency violates the Constitution." (*Reed v. Nacogdoches County*, No. 22-40126 p. 7 (5th Cir. May 19, 2023, citing *Cope v. Cogdill*, 3 F.4th 198, 209 (5th Cir. 2021), cert. denied 597 U.S. ___ (2022)).   The Defendant Officers knew Sonnier faced a substantial risk of serious medical emergency and failed to take reasonable measures to abate that risk. Instead of assisting Sonnier, the Defendant Officers stood around and made jokes about Sonnier's serious medical crisis.

## Causation

76.    As a direct result of the Defendant Officers and Firemen failing to provide first aide and immediate medical care and attention to Sonnier despite knowledge of a medical emergency, Sonnier suffered physical injury, pain, mental anguish, and death for which Plaintiffs sue herein.

77.    These injuries were not caused by any other means.

78.    These Defendants were at all times acting under the color of law.

79.    Further, the Defendant Officers and Firemen's conduct violated a clearly established constitutional right— deliberate indifference to a detainee's serious medical needs— that was clearly established well before the Defendant Officers detained Sonnier. It was clearly established law at the time of the incident that failing to render aid or to call for emergency assistance in response to a serious threat to an inmate's life constitutes deliberate indifference.

80.     As a result of these Constitutional violations to Sonnier, Plaintiffs seek compensation as set forth more specifically in the section of this Complaint entitled "Damages all Defendants."

**SECOND CAUSE OF ACTION**
**RATIFICATION - FAILURE TO SUPERVISE, TRAIN, DISCIPLINE**
**42 U.S.C. § 1983 Violation of the Fourth Amendment**
**Defendant city of Houston**

81.     Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs as if fully repeated herein.

82.     Under the ratification theory of municipal liability, the Fifth Circuit has held that, "if the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *Peterson*, 588 F.3d at 849 (quoting *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)). "[A] policymaker who defends conduct that is later shown to be unlawful does not necessarily incur liability on behalf of the municipality." *Id.* at 849 (citing *Coon v. Ledbetter*, 780 F.2d 1158, 1161-62 (5th Cir. 1986)).

83.     On Plaintiffs' governmental liability claim against the City of Houston for failing to discipline its officers for prior violations and the resulting lack of supervision:

   a.     the City of Houston and Chief Troy Finner failed to adequately discipline its employees in handling usual and recurring situations with which they deal;

   b.     Chief Finner was deliberately indifferent to the need to discipline its officers and/or employees adequately;

   c.     the failure to adequately discipline its officers proximately caused the deprivation of Sonnier's constitutional rights; and

   d.     the City of Houston and Chief Finner failed to adequately supervise and/or discipline the Defendant Officers for tasing, punching, kneeing and practically suffocating Sonnier for no lawful reason, resulting in the death of Sonnier.

Page 23

84. A final decisionmaker's adoption of a course of action tailored to a particular situation and not intended to control decisions in later situations may, in some circumstances, give rise to municipal liability under § 1983. *Bd. of Cty. Comm'rs of Bryan Cty., Okl v. Brown*, 520 U.S. 397, 406 (1997) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 481 (1986)).

85. Despite having knowledge of the Defendant Officers' wrongdoing, the falsifying of police reports, the death of Sonnier being ruled a homicide, the Defendant Officers' violation of the HPD's policies and other best police practice as described above, the City of Houston, the City Council and Chief Finner either refused or failed to adequately discipline the Defendant Officers' for their wrongful conduct which resulted in Sonnier's death, ruled as a homicide by the Harris County Medical Examiner. The City's Policymakers were aware of the out-of-control behavior of the Defendant Officers but failed to take any action. The City of Houston's failure to adequately supervise and/or discipline its officers was therefore the moving force behind the Plaintiffs' damages.

86. In defense of the Defendant Officers, Chief Finner and the city failed and/or refused to provide copies of the body cam videos and police reports despite multiple requests from Plaintiff and the media. The city refused to release this information to cover-up the wrongful actions of its officers. Even after the investigation was concluded, the City refused to release any information about the incident to protect the Defendant Officers. Despite the death of Sonnier being ruled as a homicide, none of the Defendant Officers were disciplined or terminated by the City or Chief Finner. The City took extreme measures to defend the Defendant Officers to shield itself from liability. The conduct of the Defendant Officers was extreme but instead the City engages in a campaign to tarnish the reputation of Sonnier.

87.     A custom may be shown when a municipality approves of an officer's violation of clearly established law. *See World Wide St. Preachers Fellowship*, 591 F.3d at 755. When a municipality approves a subordinate's conduct and the basis for it, liability for that conduct is chargeable against the municipality because it has "retained the authority to measure the official's conduct for conformance with their policies." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality opinion); *Groden v. City of Dallas*, 826 F.3d 280, 284 (5th Cir. 2016); *see also Balle v. Nueces Cty., Tex.*, 690 Fed. App'x 847, 852 (5th Cir. 2017). Under *Praprotnik*, "post hoc ratification by a final policymaker is sufficient to subject a city to liability because decisions by final policymakers are policy." *Hobart v. City of Stanford*, 916 F. Supp. 2d 783, 793 (S.D. Tex. 2013) (mem. op.) (citing *Praprotnik*, 485 U.S. at 127); *see also Rivera v. City of San Antonio*, No. SA-06-CA-235-XR, 2006 WL 3340908, at *13 (W.D. Tex. Nov. 15, 2006) (disagreeing with the City that post hoc approval of prior conduct cannot be the moving force behind a constitutional violation.). Recently, the Fifth Circuit recognized that demonstrating a pervasive pattern is a heavy burden, but also held that:

> When the official policymaker knows about misconduct yet allegedly fails to take remedial action, this inaction arguably shows acquiescence to the misconduct such that a jury could conclude that it represents official policy. *Sanchez v. Young Cty., Tex.,* 956 F.3d 785, 793 (5th Cir. 2020).

88.     For instance, in *Santibanes v. City of Tomball, Texas*, the court held that facts showing "that the City has a policy of turning a blind eye and knowingly refusing to thwart the unconstitutional conduct of its police officers in using excessive force" would show a city policy that was the moving force behind the excessive force claim. *Santibanes*, 654 F.Supp.2d 593, 613 (S.D. Tex. 2009). From evidence that the chief of police approved of the officer's use of force, even though the officer's conduct violated the police department's use of force policy, "it is

reasonable to infer that Sergeant Williams used deadly force with the knowledge that the City would exact no consequence for his actions." *Id.*

89.    And, *in Rivera v. City of San Antonio*, this Court found that "[w]hen the facts alleged are viewed in a light most favorable to the non-movant, it may be inferred that [the defendant] used excessive deadly force with the knowledge that no disciplinary action would be taken against him by the Police Department." *Rivera*, 2006 WL 3340908, at *13. Such facts showed that the city ratified the officers' conduct—and that such a "policy was the 'moving force' behind the violation." *Id.* (citing *Grandstaff v. City of Borger*, 767 F.2d 161, 170 (5th Cir. 1985).

90.    Moreover, a case should not have to mirror the facts of *Grandstaff* to make it past the summary judgment stage. *Grandstaff* stands for a much broader proposition:

> If there is a reckless disregard for human life and safety prevalent among the city's police officers which threatens the life and security of those whom they encounter, and *if that recklessness is attributable to the instruction or example or acceptance of or by the city policymaker, the policy itself is a repudiation of constitutional rights*. Where police officers know at the time they act that their use of deadly force in conscious disregard of the rights and safety of innocent third parties will meet with the approval of city policymakers, the affirmative link/moving force requirement is satisfied. *Grandstaff*, 767 F.2d at 170 (emphasis added).

91.    The City immediately defended the Defendant Officers' action and has never stopped, despite glaring violations of its own policy and the constitutional rights of others.

92.    The most glaring aspect of this case, however, is the fact that the Defendant Officers received no discipline, reprimand, or order for further training from Finner and/or the City, despite glaring violations of policy and conduct that the Harris County Medical Examiner ruled Sonnier's death as a homicide. By failing to do so, Finner and/or the City has ratified and approved of the Defendant Officers' conduct, which itself establishes a custom and policy

Page 26

supporting the use of unjustified, and unconstitutional, deadly force.

93.    The "failure to train claim is supported by the City's conduct after the fact—its failure to discipline or otherwise reprimand the Defendant Officers for their obvious violations and reckless behavior.    The City approved and ratified the Defendant Officers' conduct, let the entire [police] force know that it supported what the Defendant Officers did, in spite of its own policies." Because "the Defendant Officers received no discipline, reprimand, or order for further training from Finner and/or the City, despite glaring violations of policy and conduct that has been described as 'reckless' . . . [the policymakers] have ratified and approved of the Defendant Officers' conduct, which itself establishes a custom and policy supporting the use of unjustified, and unconstitutional, deadly force."

94.    As a result of the above-described policies and customs, the Defendant Officers believed that their actions and/or inaction would not be properly monitored by supervisory officers and that misconduct would not be investigated or sanctioned but would be tolerated.

95.    As a direct and proximate cause of the incident as set forth herein, Sonnier incurred extreme pain and injuries for which Plaintiffs seek compensation as set forth more specifically in the section of this Complaint entitled "Damages All Defendants."

**THIRD CAUSE OF ACTION**
**EXCESSIVE FORCE**
**Cause of Action against the Defendant Officers under 42 U.S.C. §1983 for violation of Sonnier's Fourth Amendment Right to be free from excessive force.**

96.    Plaintiffs repeat and re -allege each and every allegation contained in the above paragraphs as if fully repeated herein. Plaintiffs would show that the Defendant Officers' actions on the occasion in question were excessive and wrongful in depriving Sonnier of his

clearly established constitutional rights and was not objectively reasonable under the circumstances as alleged more fully below.

97.     Plaintiffs would show that at all times material hereto, the Defendant Officers had a duty to avoid infliction of unjustified bodily injury to Sonnier, to protect his bodily integrity and to not trample on his constitutional rights, including the right to be free from the use of excessive force.

98.     Plaintiffs would show that the Defendant Officers failed to act as a reasonable officer would have acted in the same or similar circumstances. That is, Defendant Rivera, without justification and the need to do so, tased Sonnier, Defendant Pulatie repeatedly punched Sonnier in the head and back causing abrasions and bruising and Defendant Officers Rivera, Pulatie, Fenoglio, Keefe, Maldonado, Bravo and Peacock forcefully kneed and punched Sonnier and placed their weight on him making it difficult for Sonnier to breathe. Sonnier was not attempting to harm or attack anyone when Defendant Rivera made the decision to repeatedly tase Sonnier for no lawful reason. Sonnier did not do anything to justify Defendant Pulatie repeatedly punching him in the head and back for no reason and although Sonnier was not resisting. The Defendant Officers' use of excessive force, coupled with placing Sonnier in a prone position that made it difficult to breathe, eventually resulted in Sonnier's injuries and subsequent death.

99.     The excessive force used by the Defendants Officers was not reasonable, justified nor was it necessary under the circumstances. The Defendant Officers' actions were not objectively reasonable because they followed a procedure designed to inflict excessive force and bodily injuries in restraining individuals in a non-life-threatening situation.

100.    Further, the Defendant Officers' conduct violated a clearly established constitutional right—the right to be free from excessive force—that was established well before they injured Sonnier.  At the time of the incident, the law of the Fifth Circuit was clearly established that tasing a suspect who poses no threat to the officers during the course of an arrest is an unconstitutional exercise of excessive force. *See Ramirez v. Martinez,* 716 F.3d 369, 379 (5th Cir. 2013) ("Here, Ramirez alleged he posed no threat to the officers and yet was tased twice, including once after he was handcuffed and subdued while lying face down on the ground, in violation of clearly established law."); *see also Clark v. Massengill,* 641 F. App'x 418, 420 (5th Cir. 2016)*; Carrol v. Ellington,* 800 F.3d 154, 177 (5th Cir. 2015)*; Guedry,* 703 F.3d 757, 763–64 (5th Cir. 2012)*; Gomez v. Chandler,* 163 F.3d 921, 922, 924–25 (5th Cir. 1999).

101.    As a direct and proximate cause of the incident as set forth herein, Sonnier incurred extreme pain and injuries for which Plaintiffs seek compensation as set forth more specifically in the section of this Complaint entitled "Damages All Defendants."

## FOURTH CAUSE OF ACTION
### WRONGFUL DEATH

102.    Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs as if fully repeated herein.

103.    Plaintiff Meghan Sonnier is Jermaine Sonnier's mother.

104.    Plaintiff Gabriela Lavine brings this lawsuit on behalf of J.S., who is Jermaine Sonnier's minor son.

105.    By reason of Defendants' deliberate indifference of failing to provide medical care to Sonnier and the use of excessive force, Defendants are liable for damages.

106.    To recover on a wrongful death claim under 42 U.S.C. § 1983, a plaintiff who has

standing must show both (1) the alleged constitutional deprivation required by 42 U.S.C. § 1983 and (2) the causal link between the defendant's unconstitutional acts or omissions and the death of the victim.

107.    Defendants' deliberate indifference, as described herein, caused the death of Jermaine Sonnier, which violated his constitutional rights under the Fourteenth Amendment.

108.    Defendants' conduct that caused Sonnier's death was a producing cause of injury, which resulted in the following damages: loss of a family relationship, love, support, services, emotional pain and suffering, and Defendants are liable for their acts and infliction of emotional distress caused by the wrongful death of Jermaine Sonnier.

109.    Plaintiffs seek compensation as set forth more specifically in the section of this Complaint entitled "Damages All Defendants."

**FIFTHCAUSE OF ACTION**
**SURVIVAL ACTION**

110.    Plaintiffs repeat and re-allege each and every allegation contained in the  above paragraphs as if fully repeated herein.

111.    Plaintiff Gabriela Lavine is the next friend of J.S., Sonnier's biological son. Sonnier died without a will. No administration of the Estate of Jermaine K. Sonnier is pending, and none is necessary.  J.S., through his next friend, is the sole heir of Decedent's estate. Decedent's estate has no debts at the time of his death, no real property, and no other children.

112.    Jermaine Sonnier died because of the Defendants' wrongful conduct.

113.    Jermaine Sonnier would have been entitled to bring this action against the Defendants if he had lived.

Page 30

114.    The Decedent's right of action for wrongful conduct against the Defendants survives in favor of the estate of the deceased.

115.    The Defendants are liable to the Estate of the deceased for the loss of Jermaine. Sonnier's life, pain and suffering, and the violation of his civil rights.

116.    Plaintiffs seek compensation as set forth more specifically in the section of this Complaint entitled "Damages All Defendants."

## VI.

## DAMAGES ALL DEFENDANTS

117.    **Actual damages.** Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs as if fully repeated herein.

118.    Defendants' acts and/or omissions were a proximate cause of the following actual damages suffered by Plaintiffs, and Defendants should be held jointly and severally liable for the following damages:

**a.    Estate of Jermaine Sonnier (Survival Claim).**
1.    Conscious pain and mental anguish suffered by Jermaine Sonnier prior to his death;
2.    Funeral and burial expenses; and
3.    Exemplary Damages.

**b.    Meghan Sonnier Simms (as wrongful death beneficiary of Jermaine Sonnier).**
1.    Mental anguish—the emotional pain, torment, and suffering experienced by Meghan Sonnier Simms because of the death of Jermaine Sonnier—that Meghan Sonnier Simms sustained in the past and that she will, in reasonable probability, sustain in the future;
2.    Loss of companionship and society—the loss of the positive benefits flowing from the love, comfort, companionship, and society that Meghan Sonnier Simms would have received from Jermaine Sonnier had he lived—that Meghan Sonnier Simms sustained in the past and that she will, in reasonable probability, sustain in the future;
3.    Pecuniary loss—loss of the care, maintenance, support, services, advice, counsel,

and reasonable contributions of a pecuniary value that Meghan Sonnier Simms would have received from Jermaine Sonnier had he lived—that Meghan Sonnier Simms sustained in the past and that she will, in reasonable probability will sustain in the future.

4.    Pre- and post-judgment interest at the highest rate permitted by State and Federal law.

**c.    Gabriela Lavine, as next friend of J.S. (as wrongful death beneficiaries of Jermaine Sonnier).**

1.    Mental anguish—the emotional pain, torment, and suffering experienced by J.S. because of the death of Jermaine Sonnier—that J.S. sustained in the past and that he will, in reasonable probability, sustain in the future;

2.    Loss of companionship and society—the loss of the positive benefits flowing from the love, comfort, companionship, and society that J.S. would have received from Jermaine Sonnier had he lived—that J.S. sustained in the past and that he will, in reasonable probability, sustain in the future;

3.    Pecuniary loss—loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value that J.S. would have received from Jermaine Sonnier had he lived—that J.S. sustained in the past and that he will, in reasonable probability will sustain in the future.

4.    Pre- and post-judgment interest at the highest rate permitted by State and Federal law.

119.    **Punitive/Exemplary Damages against the Defendant Officers and Firemen.**

Punitive/exemplary damages are recoverable under section 1983 when the conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others. Here, the conduct of the Defendant Officers and Firemen was done with evil motive or intent, or at the very least, was reckless or callously indifferent to the federally protected rights of Sonnier. As such, the Plaintiffs request punitive and exemplary damages to deter this type of conduct in the future.

120.    Plaintiffs seek unliquidated damages in an amount that is within the jurisdictional limits of the court.

## VII.
## COSTS AND ATTORNEY FEES

121.    Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs as if fully repeated herein.  Plaintiffs are entitled to an award of attorney fees and costs under 42 U.S.C. § 1988(b).  As such, Plaintiffs request the Court to award costs and attorney fees incurred in the Plaintiffs' prosecution of this litigation.

Respectfully submitted,

By: /s/ DARYL K. WASHINGTON
    Daryl K. Washington
    State Bar No. 24013714
    WASHINGTON LAW FIRM, PC
    325 N. St. Paul St., Suite 3950
    Dallas, Texas 75201
    214-880-4883
    214-751-6685 - fax
    Email: dwashington@dwashlawfirm.com

**ATTORNEYS FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that on **August 25, 2023**, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Southern District of Texas, using the electronic case filing system of the court.  The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this notice as service of this document by electronic means.

                                       */s/ Daryl K. Washington*
                                       **Daryl K. Washington**